Justice Ginsburg,
with whom
Justice Stevens, Justice Souter, and Justice Breyer join, dissenting.
In Planned Parenthood of Southeastern Pa. v. Casey, 505 U. S. 833, 844 (1992), the Court declared that “[l]iberty finds no refuge in a jurisprudence of doubt.” There was, the Court said, an “imperative” need to dispel doubt as to “the meaning and reach” of the Court’s 7-to-2 judgment, rendered nearly two decades earlier in Roe v. Wade, 410 U. S. 113 (1973). 505 U. S., at 845. Responsive to that need, the Court endeavored to provide secure guidance to “[sjtate and federal courts as well as legislatures throughout the Union,” by defining “the rights of the woman and the legitimate authority of the State respecting the termination of pregnancies by abortion procedures.” Ibid.
Taking care to speak plainly, the Casey Court restated and reaffirmed Roe’s essential holding. 505 U. S., at 845-846. First, the Court addressed the type of abortion regulation permissible prior to fetal viability. It recognized “the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State.” Id., at 846. Second, the Court acknowledged “the State’s power to restrict abortions after fetal viability, if the law *170 contains exceptions for pregnancies which endanger the woman’s life or healthIbid, (emphasis added). Third, the Court confirmed that “the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.” Ibid, (emphasis added).
In reaffirming Roe, the Casey Court described the centrality of “the decision whether to bear ... a child,” Eisenstadt v. Baird, 405 U. S. 438, 453 (1972), to a woman’s “dignity and autonomy,” her “personhood” and “destiny,” her “conception of... her place in society.” 505 U. S., at 851-852. Of signal importance here, the Casey Court stated with unmistakable clarity that state regulation of access to abortion procedures, even after viability, must protect “the health of the woman.” Id., at 846.
Seven years ago, in Stenberg v. Carhart, 530 U. S. 914 (2000), the Court invalidated a Nebraska statute criminalizing the performance of a medical procedure that, in the political arena, has been dubbed “partial-birth abortion.”[1] With fidelity to the Roe-Casey line of precedent, the Court held the Nebraska statute unconstitutional in part because it lacked the requisite protection for the preservation of a woman’s health. Stenberg, 530 U. S., at 930; cf. Ayotte v. Planned Parenthood of Northern New Eng., 546 U. S. 320, 327 (2006).
Today’s decision is alarming. It refuses to take Casey and Stenberg seriously. It tolerates, indeed applauds, federal intervention to ban nationwide a procedure found necessary and proper in certain cases by the American College of Ob *171 stetricians and Gynecologists (ACOG). It blurs the line, firmly drawn in Casey, between previability and postviability abortions. And, for the first time since Roe, the Court blesses a prohibition with no exception safeguarding a woman’s health.
I dissent from the Court’s disposition. Retreating from prior rulings that abortion restrictions cannot be imposed absent an exception safeguarding a woman’s health, the Court upholds an Act that surely would not survive under the close scrutiny that previously attended state-decreed limitations on a woman’s reproductive choices.
I
A
As Casey comprehended, at stake in cases challenging abortion restrictions is a woman’s “control over her [own] destiny.” 505 U. S., at 869 (plurality opinion). See also id., at 852 (majority opinion).[2] “There was a time, not so long ago,” when women were “regarded as the center of home and family life, with attendant special responsibilities that precluded full and independent legal status under the Constitution.” Id., at 896-897 (quoting Hoyt v. Florida, 368 U. S. 57, 62 (1961)). Those views, this Court made clear in Casey, “are no longer consistent with our understanding of the family, the individual, or the Constitution.” 505 U. S., at 897. Women, it is now acknowledged, have the talent, capacity, and right “to participate equally in the economic and social life of the Nation.” Id., at 856. Their ability to realize their full potential, the Court recognized, is intimately connected to “their ability to control their reproductive lives.” *172 Ibid. Thus, legal challenges to undue restrictions on abortion procedures do not seek to vindicate some generalized notion of privacy; rather, they center on a woman’s autonomy to determine her life’s course, and thus to enjoy equal citizenship stature. See, e. g., Siegel, Reasoning from the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection, 44 Stan. L. Rev. 261 (1992); Law, Rethinking Sex and the Constitution, 132 U. Pa. L. Rev. 955, 1002-1028 (1984).
In keeping with this comprehension of the right to reproductive choice, the Court has consistently required that laws regulating abortion, at any stage of pregnancy and in all cases, safeguard a woman's health. See, e. g., Ayotte, 546 U. S., at 327-328 (“[Q]ur precedents hold . . . that a State may not restrict access to abortions that are necessary, in appropriate medical judgment, for the preservation of the life or health of the [woman].” (quoting Casey, 505 U. S., at 879 (plurality opinion))); Stenberg, 530 U. S., at 930 (“Since the law requires a health exception in order to validate even a postviability abortion regulation, it at a minimum requires the same in respect to previability regulation.”). See also Thornburgh v. American College of Obstetricians and Gynecologists, 476 U. S. 747, 768-769 (1986) (invalidating a post-viability abortion regulation for “failure] to require that [a pregnant woman’s] health be the physician’s paramount consideration”).
We have thus ruled that a State must avoid subjecting women to health risks not only where the pregnancy itself creates danger, but also where state regulation forces women to resort to less safe methods of abortion. See Planned Parenthood of Central Mo. v. Danforth, 428 U. S. 52, 79 (1976) (holding unconstitutional a ban on a method of abortion that “force[d] a woman ... to terminate her pregnancy by methods more dangerous to her health”). See also Stenberg, 530 U. S., at 931 (“[Our cases] make clear that a risk to . . . women’s health is the same whether it happens *173 to arise from regulating a particular method of abortion, or from barring abortion entirely.”). Indeed, we have applied the rule that abortion regulation must safeguard a woman’s health to the particular procedure at issue here — intact dilation and evacuation (intact D&E).[3]
In Stenberg, we expressly held that a statute banning intact D&E was unconstitutional in part because it lacked a health exception. 530 U. S., at 930, 937. We noted that there existed a “division of medical opinion” about the rela *174 tive safety of intact D&E, id., at 937, but we made clear that as long as “substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women’s health,” a health exception is required, id., at 938. We explained:
“The word ‘necessary’ in Casey’s phrase ‘necessary, in appropriate medical judgment, for the preservation of the life or health of the [pregnant woman],’ cannot refer to an absolute necessity or to absolute proof. Medical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases. Neither can that phrase require unanimity of medical opinion. Doctors often differ in their estimation of comparative health risks and appropriate treatment. And Casey’s words ‘appropriate medical judgment’ must embody the judicial need to tolerate responsible differences of medical opinion . . . .” Id., at 937 (citation omitted).
Thus, we reasoned, division in medical opinion “at most means uncertainty, a factor that signals the presence of risk, not its absence.” Ibid. “[A] statute that altogether forbids [intact D&E]. . . consequently must contain a health exception.” Id., at 938. See also id., at 948 (O’Connor, J., concurring) (“Th[e] lack of a health exception necessarily renders the statute unconstitutional.”).
B
In 2003, a few years after our ruling in Stenberg, Congress passed the Partial-Birth Abortion Ban Act — without an exception for women’s health. See 18 U. S. C. § 1531(a) (2000 ed., Supp. IV).[4] The congressional findings on which the *175 Partial-Birth Abortion Ban Act rests do not withstand inspection, as the lower courts have determined and this Court is obliged to concede. Ante, at 165-166. See National Abortion Federation v. Ashcroft, 330 F. Supp. 2d 436, 482 (SDNY 2004) (“Congress did not. . . carefully consider the evidence before arriving at its findings.”), aff’d sub nom. National Abortion Federation v. Gonzales, 437 F. 3d 278 (CA2 2006). See also Planned Parenthood Federation of Am. v. Ashcroft, 320 F. Supp. 2d 957, 1019 (ND Cal. 2004) (“[N]one of the six physicians who testified before Congress had ever performed an intact D&E. Several did not provide abortion services at all; and one was not even an obgyn. . . . [T]he oral testimony before Congress was not only unbalanced, but intentionally polemic.”), aff’d, 435 F. 3d 1163 (CA9 2006); Carhart v. Ashcroft, 331 F. Supp. 2d 805, 1011 (Neb. 2004) (“Congress arbitrarily relied upon the opinions of doctors who claimed to have no (or very little) recent and relevant experience with surgical abortions, and disregarded the views of doctors who had significant and relevant experience with those procedures.”), aff’d, 413 F. 3d 791 (CA8 2005).
Many of the Act’s recitations are incorrect. See ante, at 165-166. For example, Congress determined that no medical schools provide instruction on intact D&E. §2(14)(B), 117 Stat. 1204, notes following 18 U. S. C. §1531 (2000 ed., Supp. IV), p. 769, ¶ (14)(B) (Congressional Findings). But in fact, numerous leading medical schools teach the procedure. See Planned Parenthood, 320 F. Supp. 2d, at 1029; National Abortion Federation, 330 F. Supp. 2d, at 479. See also Brief for ACOG as Amicus Curiae 18 (“Among the schools that now teach the intact variant are Columbia, Cornell, Yale, New York University, Northwestern, University of Pitts *176 burgh, University of Pennsylvania, University of Rochester, and University of Chicago.”).
More important, Congress claimed there was a medical consensus that the banned procedure is never necessary. Congressional Findings ¶ (1). But the evidence “very clearly demonstrate^] the opposite.” Planned Parenthood, 320 F. Supp. 2d, at 1025. See also Carhart, 331 F. Supp. 2d, at 1008-1009 (“[T]here was no evident consensus in the record that Congress compiled. There was, however, a substantial body of medical opinion presented to Congress in opposition. If anything ... the congressional record establishes that there was a ‘consensus’ in favor of the banned procedure.”); National Abortion Federation, 330 F. Supp. 2d, at 488 (“The congressional record itself undermines [Congress’] finding” that there is a medical consensus that intact D&E “is never medically necessary and should be prohibited.” (internal quotation marks omitted)).
Similarly, Congress found that “[t]here is no credible medical evidence that partial-birth abortions are safe or are safer than other abortion procedures.” Congressional Findings (14)(B), in notes following 18 U. S. C. § 1531 (2000 ed., Supp. IV), p. 769. But the congressional record includes letters from numerous individual physicians stating that pregnant women’s health would be jeopardized under the Act, as well as statements from nine professional associations, including ACOG, the American Public Health Association, and the California Medical Association, attesting that intact D&E carries meaningful safety advantages over other methods. See National Abortion Federation, 330 F. Supp. 2d, at 490. See also Planned Parenthood, 320 F. Supp. 2d, at 1021 (“Congress in its findings ... chose to disregard the statements by ACOG and other medical organizations.”). No comparable medical groups supported the ban. In fact, “all of the government's own witnesses disagreed with many of the specific congressional findings.” Id., at 1024.
*177 c
In contrast to Congress, the District Courts made findings after full trials at which all parties had the opportunity to present their best evidence. The courts had the benefit of “much more extensive medical and scientific evidence . . . concerning the safety and necessity of intact D&Es.” Planned Parenthood, 320 F. Supp. 2d, at 1014; cf. National Abortion Federation, 330 F. Supp. 2d, at 482 (District Court “heard more evidence during its trial than Congress heard over the span of eight years.”).
During the District Court trials, “numerous” “extraordinarily accomplished” and “very experienced” medical experts explained that, in certain circumstances and for certain women, intact D&E is safer than alternative procedures and necessary to protect women's health. Carhart, 331 F. Supp. 2d, at 1024-1027; see Planned Parenthood, 320 F. Supp. 2d, at 1001 (“[A]ll of the doctors who actually perform intact D&Es concluded that in their opinion and clinical judgment, intact D&Es remain the safest option for certain individual women under certain individual health circumstances, and are significantly safer for these women than other abortion techniques, and are thus medically necessary.”); cf. ante, at 161 (“Respondents presented evidence that intact D&E may be the safest method of abortion, for reasons similar to those adduced in Stenberg.”).
According to the expert testimony plaintiffs introduced, the safety advantages of intact D&E are marked for women with certain medical conditions, for example, uterine scarring, bleeding disorders, heart disease, or compromised immune systems. See Carhart, 331 F. Supp. 2d, at 924-929, 1026-1027; National Abortion Federation, 330 F. Supp. 2d, at 472-473; Planned Parenthood, 320 F. Supp. 2d, at 992-994, 1001. Further, plaintiffs’ experts testified that intact D&E is significantly safer for women with certain pregnancy-related conditions, such as placenta previa and accreta, and for women carrying fetuses with certain abnormalities, such *178 as severe hydrocephalus. See Carhart, 331 F. Supp. 2d, at 924, 1026-1027; National Abortion Federation, 330 F. Supp. 2d, at 473-474; Planned Parenthood, 320 F. Supp. 2d, at 992-994, 1001. See also Stenberg, 530 U. S., at 929; Brief for ACOG as Amicus Curiae 2, 13-16.
Intact D&E, plaintiffs’ experts explained, provides safety benefits over D&E by dismemberment for several reasons: First, intact D&E minimizes the number of times a physician must insert instruments through the cervix and into the uterus, and thereby reduces the risk of trauma to, and perforation of, the cervix and uterus — the most serious complication associated with nonintact D&E. See Carhart, 331 F. Supp. 2d, at 923-928,1025; National Abortion Federation, 330 F. Supp. 2d, at 471; Planned Parenthood, 320 F. Supp. 2d, at 982, 1001. Second, removing the fetus intact, instead of dismembering it in útero, decreases the likelihood that fetal tissue will be retained in the uterus, a condition that can cause infection, hemorrhage, and infertility. See Carhart, 331 F. Supp. 2d, at 923-928, 1025-1026; National Abortion Federation, 330 F. Supp. 2d, at 472; Planned Parenthood, 320 F. Supp. 2d, at 1001. Third, intact D&E diminishes the chances of exposing the patient’s tissues to sharp bony fragments sometimes resulting from dismemberment of the fetus. See Carhart, 331 F. Supp. 2d, at 923-928, 1026; National Abortion Federation, 330 F. Supp. 2d, at 471; Planned Parenthood, 320 F. Supp. 2d, at 1001. Fourth, intact D&E takes less operating time than D&E by dismemberment, and thus may reduce bleeding, the risk of infection, and complications relating to anesthesia. See Carhart, 331 F. Supp. 2d, at 923-928,1026; National Abortion Federation, 330 F. Supp. 2d, at 472; Planned Parenthood, 320 F. Supp. 2d, at 1001. See also Stenberg, 530 U. S., at 928-929, 932; Brief for ACOG as Amicus Curiae 2,11-13.
Based on thoroughgoing review of the trial evidence and the congressional record, each of the District Courts to consider the issue rejected Congress’ findings as unreasonable *179 and not supported by the evidence. See Carhart, 331 F. Supp. 2d, at 1008-1027; National Abortion Federation, 330 F. Supp. 2d, at 482, 488-491; Planned Parenthood, 320 F. Supp. 2d, at 1032. The trial courts concluded, in contrast to Congress’ findings, that “significant medical authority supports the proposition that in some circumstances, [intact D&E] is the safest procedure.” Id., at 1033 (quoting Stenberg, 530 U. S., at 932); accord Carhart, 331 F. Supp. 2d, at 1008-1009, 1017-1018; National Abortion Federation, 330 F. Supp. 2d, at 480-482;[5] cf. Stenberg, 530 U. S., at 932 (“[T]he record shows that significant medical authority supports the proposition that in some circumstances, [intact D&E] would be the safest procedure.”).
The District Courts’ findings merit this Court’s respect. See, e. g., Fed. Rule Civ. Proc. 52(a); Salve Regina College v. Russell, 499 U. S. 225, 233 (1991). Today’s opinion supplies no reason to reject those findings. Nevertheless, despite the District Courts’ appraisal of the weight of the evidence, and in undisguised conflict with Stenberg, the Court asserts that the Partial-Birth Abortion Ban Act can survive “when . . . medical uncertainty persists.” Ante, at 163. This assertion is bewildering. Not only does it defy the Court’s longstanding precedent affirming the necessity of a health exception, with no carve-out for circumstances of medical uncertainty, see supra, at 172-173; it gives short shrift to the records before us, carefully canvassed by the District Courts. *180 Those records indicate that “the majority of highly-qualified experts on the subject believe intact D&E to be the safest, most appropriate procedure under certain circumstances.” Planned Parenthood, 320 F. Supp. 2d, at 1034. See supra, at 177.
The Court acknowledges some of this evidence, ante, at 161, but insists that, because some witnesses disagreed with ACOG and other experts’ assessment of risk, the Act can stand. Ante, at 162,166-167. In this insistence, the Court brushes under the rug the District Courts’ well-supported findings that the physicians who testified that intact D&E is never necessary to preserve the health of a woman had slim authority for their opinions. They had no training for, or personal experience with, the intact D&E procedure, and many performed abortions only on rare occasions. See Planned Parenthood, 320 F. Supp. 2d, at 980; Carhart, 331 F. Supp. 2d, at 1025; cf. National Abortion Federation, 330 F. Supp. 2d, at 462-464. Even indulging the assumption that the Government witnesses were equally qualified to evaluate the relative risks of abortion procedures, their testimony could not erase the “significant medical authority supporting] the proposition that in some circumstances, [intact D&E] would be the safest procedure.” Stenberg, 530 U. S., at 932.[6]
*181 II
A
The Court offers flimsy and transparent justifications for upholding a nationwide ban on intact D&E sans any exception to safeguard a woman’s health. Today’s ruling, the Court declares, advances “a premise central to [Casey’s] conclusion” — i. e., the Government’s “legitimate and substantial interest in preserving and promoting fetal life.” Ante, at 145. See also ante, at 146 (“[W]e must determine whether the Act furthers the legitimate interest of the Government in protecting the life of the fetus that may become a child.”). But the Act scarcely furthers that interest: The law saves not a single fetus from destruction, for it targets only a method of performing abortion. See Stenberg, 530 U. S., at 930. And surely the statute was not designed to protect the lives or health of pregnant women. Id., at 951 (Ginsburg, J., concurring); cf. Casey, 505 U. S., at 846 (recognizing along with the State’s legitimate interest in the life of the fetus, its “legitimate interes[t] ... in protecting the health of the woman” (emphasis added)). In short, the Court upholds a law that, while doing nothing to “preserve] . . . fetal life,” ante, at 145, bars a woman from choosing intact D&E although her doctor “reasonably believes [that procedure] will best protect [her],” Stenberg, 530 U. S., at 946 (Stevens, J., concurring).
As another reason for upholding the ban, the Court emphasizes that the Act does not proscribe the nonintact D&E procedure. See ante, at 164. But why not, one might ask. *182 Nonintact D&E could equally be characterized as “brutal,” ante, at 157, involving as it does “tear[ing] [a fetus] apart” and “ripp[ing] off” its limbs, ante, at 135. “[T]he notion that either of these two equally gruesome procedures ... is more akin to infanticide than the other, or that the State furthers any legitimate interest by banning one but not the other, is simply irrational.” Stenberg, 530 U. S., at 946-947 (Stevens, J., concurring).
Delivery of an intact, albeit nonviable, fetus warrants special condemnation, the Court maintains, because a fetus that is not dismembered resembles an infant. Ante, at 158. But so, too, does a fetus delivered intact after it is terminated by injection a day or two before the surgical evacuation, ante, at 136, 164, or a fetus delivered through medical induction or cesarean, ante, at 140. Yet, the availability of those procedures — along with D&E by dismemberment — the Court says, saves the ban on intact D&E from a declaration of unconstitutionality. Ante, at 164-165. Never mind that the procedures deemed acceptable might put a woman’s health at greater risk. See supra, at 180, and n. 6; cf. ante, at 136, 161-162.
Ultimately, the Court admits that “moral concerns” are at work, concerns that could yield prohibitions on any abortion. See ante, at 158 (“Congress could ... conclude that the type of abortion proscribed by the Act requires specific regulation because it implicates additional ethical and moral concerns that justify a special prohibition.”). Notably, the concerns expressed are untethered to any ground genuinely serving the Government’s interest in preserving life. By allowing such concerns to carry the day and case, overriding fundamental rights, the Court dishonors our precedent. See, e. g., Casey, 505 U. S., at 850 (“Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision. Our obligation is to define the liberty of all, not to mandate our own moral code.”); Lawrence v. Texas, 539 U. S. 558, 571 (2003) (Though “[f]or many persons [objections to homosexual conduct] are not trivial *183 concerns but profound and deep convictions accepted as ethical and moral principles,” the power of the State may not be used “to enforce these views on the whole society through operation of the criminal law.” (citing Casey, 505 U. S., at 850)).
Revealing in this regard, the Court invokes an antiabortion shibboleth for which it concededly has no reliable evidence: Women who have abortions come to regret their choices, and consequently suffer from “[s]evere depression and loss of esteem.” Ante, at 159.[7] Because of women’s *184 fragile emotional state and because of the “bond of love the mother has for her child,” the Court worries, doctors may withhold information about the nature of the intact D&E procedure. Ante, at 159.[8] The solution the Court approves, then, is not to require doctors to inform women, accurately and adequately, of the different procedures and their attendant risks. Cf. Casey, 505 U. S., at 873 (plurality opinion) (“States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning.”). Instead, the Court deprives women of the right to make an autonomous choice, even at the expense of their safety.[9]
*185 This way of thinking reflects ancient notions about women’s place in the family and under the Constitution— ideas that have long since been discredited. Compare, e. g., Muller v. Oregon, 208 U. S. 412, 422-428 (1908) (“protective” legislation imposing hours-of-work limitations on women only held permissible in view of women’s “physical structure and a proper discharge of her maternal functio[n]”); Bradwell v. State, 16 Wall. 130, 141 (1873) (Bradley, J., concurring) (“Man is, or should be, woman’s protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life.. .. The paramount destiny and mission of woman are to fulfil[l] the noble and benign offices of wife and mother.”), with United States v. Virginia, 518 U. S. 515, 533, 542, n. 12 (1996) (State may not rely on “overbroad generalizations” about the “talents, capacities, or preferences” of women; “[s]uch judgments have . . . impeded . . . women’s progress toward full citizenship stature throughout our Nation’s history”); Califano v. Goldfarb, 430 U. S. 199, 207 (1977) (gender-based Social Security classification rejected because it rested on “archaic and overbroad generalizations” “such as assumptions as to [women’s] dependency” (internal quotation marks omitted)).
Though today’s majority may regard women’s feelings on the matter as “self-evident,” ante, at 159, this Court has repeatedly confirmed that “[t]he destiny of the woman must be shaped... on her own conception of her spiritual imperatives and her place in society,” Casey, 505 U. S., at 852. See also *186 id., at 877 (plurality opinion) (“[M]eans chosen by the State to further the interest in potential life must be calculated to inform the woman’s free choice, not hinder it.”); supra, at 171-172.
B
In cases on a “woman’s liberty to determine whether to [continue] her pregnancy,” this Court has identified viability as a critical consideration. See Casey, 505 U. S., at 869-870 (plurality opinion). “[T]here is no line [more workable] than viability,” the Court explained in Casey, for viability is “the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman. ... In some broad sense it might be said that a woman who fails to act before viability has consented to the State’s intervention on behalf of the developing child.” Id., at 870.
Today, the Court blurs that line, maintaining that “[t]he Act [legitimately] applies] both previability and postviability because ... a fetus is a living organism while within the womb, whether or not it is viable outside the womb.” Ante, at 147. Instead of drawing the line at viability, the Court refers to Congress’ purpose to differentiate “abortion and infanticide” based not on whether a fetus can survive outside the womb, but on where a fetus is anatomically located when a particular medical procedure is performed. See ante, at 158 (quoting Congressional Findings ¶ (14)(G)).
One wonders how long a line that saves no fetus from destruction will hold in face of the Court’s “moral concerns.” See supra, at 182; cf. ante, at 147 (noting that “[i]n this litigation” the Attorney General “does not dispute that the Act would impose an undue burden if it covered standard D&E”). The Court’s hostility to the right Roe and Casey secured is not concealed. Throughout, the opinion refers to obstetrician-gynecologists and surgeons who perform abor *187 tions not by the titles of their medical specialties, but by the pejorative label “abortion doctor.” Ante, at 144, 154, 155, 161, 163. A fetus is described as an “unborn child,” and as a “baby,” ante, at 134, 138; second-trimester, previability abortions are referred to as “late-term,” ante, at 156; and the reasoned medical judgments of highly trained doctors are dismissed as “preferences” motivated by “mere convenience,” ante, at 134, 166. Instead of the heightened scrutiny we have previously applied, the Court determines that a “rational” ground is enough to uphold the Act, ante, at 158, 166. And, most troubling, Casey’s principles, confirming the continuing vitality of “the essential holding of Roe,” are merely “assumefd]” for the moment, ante, at 146, 161, rather than “retained” or “reaffirmed,” Casey, 505 U. S., at 846.
Ill
A
The Court further confuses our jurisprudence when it declares that “facial attacks” are not permissible in “these circumstances,” i. e., where medical uncertainty exists. Ante, at 167; see ibid. (“In an as-applied challenge the nature of the medical risk can be better quantified and balanced than in a facial attack.”). This holding is perplexing given that, in materially identical circumstances we held that a statute lacking a health exception was unconstitutional on its face. Stenberg, 530 U. S., at 930; see id., at 937 (in facial challenge, law held unconstitutional because “significant body of medical opinion believes [the] procedure may bring with it greater safety for some patients” (emphasis added)). See also Sabri v. United States, 541 U. S. 600, 609-610 (2004) (identifying abortion as one setting in which we have recognized the validity of facial challenges); Fallon, Making Sense of Overbreadth, 100 Yale L. J. 853, 859, n. 29 (1991) (“[Virtually all of the abortion cases reaching the Supreme Court since Roe v. Wade, 410 U. S. 113 (1973), have involved facial attacks on state statutes, and the Court, whether accepting *188 or rejecting the challenges on the merits, has typically accepted this framing of the question presented.”). Accord Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1356 (2000); Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev. 235, 271-276 (1994).
Without attempting to distinguish Stenberg and earlier decisions, the majority asserts that the Act survives review because respondents have not shown that the ban on intact D&E would be unconstitutional “in a large fraction of [relevant] cases.” Ante, at 167 (citing Casey, 505 U. S., at 895). But Casey makes clear that, in determining whether any restriction poses an undue burden on a “large fraction” of women, the relevant class is not “all women,” nor “all pregnant women,” nor even all women “seeking abortions.” Ibid. Rather, a provision restricting access to abortion “must be judged by reference to those [women] for whom it is an actual rather than an irrelevant restriction.” Ibid. Thus the absence of a health exception burdens all women for whom it is relevant — women who, in the judgment of their doctors, require an intact D&E because other procedures would place their health at risk.[10] Cf. Stenberg, 530 U. S., at 934 (accepting the “relative rarity” of medically indicated intact D&Es as true but not “highly relevant”— for “the health exception question is whether protecting women’s health requires an exception for those infrequent occasions”); Ayotte, 546 U. S., at 328 (facial challenge entertained where “[i]n some very small percentage of cases . . . women . . . need immediate abortions to avert serious and often irreversible damage to their health”). It makes no sense to conclude that this facial challenge fails because respondents have not shown that a health exception is nec *189 essary for a large fraction of second-trimester abortions, including those for which a health exception is unnecessary: The very purpose of a health exception is to protect women in exceptional cases.
B
If there is anything at all redemptive to be said of today’s opinion, it is that the Court is not willing to foreclose entirely a constitutional challenge to the Act. “The Act is open,” the Court states, “to a proper as-applied challenge in a discrete case.” Ante, at 168; see ante, at 167 (“The Government has acknowledged that preenforcement, as-applied challenges to the Act can be maintained.”). But the Court offers no clue on what a “proper” lawsuit might look like. See ante, at 167-168. Nor does the Court explain why the injunctions ordered by the District Courts should not remain in place, trimmed only to exclude instances in which another procedure would safeguard a woman’s health at least equally well. Surely the Court cannot mean that no suit may be brought until a woman’s health is immediately jeopardized by the ban on intact D&E. A woman “suffer[ing] from medical complications,” ante, at 168, needs access to the medical procedure at once and cannot wait for the judicial process to unfold. See Ayotte, 546 U. S., at 328.
The Court appears, then, to contemplate another lawsuit by the initiators of the instant actions. In such a second round, the Court suggests, the challengers could succeed upon demonstrating that “in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used.” Ante, at 167. One may anticipate that such a preenforcement challenge will be mounted swiftly, to ward off serious, sometimes irremediable harm, to women whose health would be endangered by the intact D&E prohibition.
The Court envisions that in an as-applied challenge, “the nature of the medical risk can be better quantified and balanced.” Ibid. But it should not escape notice that the rec *190 ord already includes hundreds and hundreds of pages of testimony identifying “discrete and well-defined instances” in which recourse to an intact D&E would better protect the health of women with particular conditions. See supra, at 177-179. Record evidence also documents that medical exigencies, unpredictable in advance, may indicate to a well-trained doctor that intact D&E is the safest procedure. See ibid. In light of this evidence, our unanimous decision just one year ago in Ayotte counsels against reversal. See 546 U. S., at 331 (remanding for reconsideration of the remedy for the absence of a health exception, suggesting that an injunction prohibiting unconstitutional applications might suffice).
The Court’s allowance only of an “as-applied challenge in a discrete case,” ante, at 168 — jeopardizes women’s health and places doctors in an untenable position. Even if courts were able to carve out exceptions through piecemeal litigation for “discrete and well-defined instances,” ante, at 167, women whose circumstances have not been anticipated by prior litigation could well be left unprotected. In treating those women, physicians would risk criminal prosecution, conviction, and imprisonment if they exercise their best judgment as to the safest medical procedure for their patients. The Court is thus gravely mistaken to conclude that narrow as-applied challenges are “the proper manner to protect the health of the woman.” Cf. ibid.
IV
As the Court wrote in Casey, “overruling Roe’s central holding would not only reach an unjustifiable result under principles of stare decisis, but would seriously weaken the Court’s capacity to exercise the judicial power and to function as the Supreme Court of a Nation dedicated to the rule of law.” 505 U. S., at 865. “[T]he very concept of the rule of law underlying our own Constitution requires such continuity over time that a respect for precedent is, by definition, *191 indispensable.” Id., at 854. See also id., at 867 (“[T]o overrule under fire in the absence of the most compelling reason to reexamine a watershed decision would subvert the Court’s legitimacy beyond any serious question.”).
Though today’s opinion does not go so far as to discard Roe or Casey, the Court, differently composed than it was when we last considered a restrictive abortion regulation, is hardly faithful to our earlier invocations of “the rule of law” and the “principles of stare decisis." Congress imposed a ban despite our clear prior holdings that the State cannot proscribe an abortion procedure when its use is necessary to protect a woman’s health. See supra, at 174-175, n. 4. Although Congress’ findings could not withstand the crucible of trial, the Court defers to the legislative override of our Constitution-based rulings. See supra, at 174-176. A decision so at odds with our jurisprudence should not have staying power.
In sum, the notion that the Partial-Birth Abortion Ban Act furthers any legitimate governmental interest is, quite simply, irrational. The Court’s defense of the statute provides no saving explanation. In candor, the Act, and the Court’s defense of it, cannot be understood as anything other than an effort to chip away at a right declared again and again by this Court — and with increasing comprehension of its centrality to women’s lives. See supra, at 171, n. 2; supra, at 174-175, n. 4. When “a statute burdens constitutional rights and all that can be said on its behalf is that it is the vehicle that legislators have chosen for expressing their hostility to those rights, the burden is undue.” Stenberg, 530 U. S., at 952 (Ginsburg, J., concurring) (quoting Hope Clinic v. Ryan, 195 F. 3d 857, 881 (CA7 1999) (Posner, C. J., dissenting)).
* * *
For the reasons stated, I dissent from the Court’s disposition and would affirm the judgments before us for review.

 The term “partial-birth abortion” is neither recognized in the medical literature nor used by physicians who perform second-trimester abortions. See Planned Parenthood Federation of Am. v. Ashcroft, 320 F. Supp. 2d 957, 964 (ND Cal. 2004), aff’d, 435 F. 3d 1163 (CA9 2006). The medical community refers to the procedure as either dilation & extraction (D&X) or intact dilation and evacuation (intact D&E). See, e. g., ante, at 136; Stenberg v. Carhart, 530 U. S. 914, 927 (2000).

 Planned Parenthood of Southeastern Pa. v. Casey, 505 U. S. 833, 851-852 (1992), described more precisely than did Roe v. Wade, 410 U. S. 113 (1973), the impact of abortion restrictions on women’s liberty. Roe’s focus was in considerable measure on “vindicating] the right of the physician to administer medical treatment according to his professional judgment.” Id., at 165.

 Dilation and evacuation (D&E) is the most frequently used abortion procedure during the second trimester of pregnancy; intact D&E is a variant of the D&E procedure. See ante, at 135, 137; Stenberg, 530 U. S., at 924, 927; Planned Parenthood, 320 F. Supp. 2d, at 966. Second-trimester abortions (i e., midpregnancy, previability abortions) are, however, relatively uncommon. Between 85 and 90 percent of all abortions performed in the United States take place during the first three months of pregnancy. See ante, at 134. See also Stenberg, 530 U. S., at 923-927; National Abortion Federation v. Ashcroft, 330 F. Supp. 2d 436, 464 (SDNY 2004), aff’d sub nom. National Abortion Federation v. Gonzales, 437 F. 3d 278 (CA2 2006); Planned Parenthood, 320 F. Supp. 2d, at 960, and n. 4.
Adolescents and indigent women, research suggests, are more likely than other women to have difficulty obtaining an abortion during the first trimester of pregnancy. Minors may be unaware they are pregnant until relatively late in pregnancy, while poor women’s financial constraints are an obstacle to timely receipt of services. See Finer, Frohwirth, Dauphinee, Singh, & Moore, Timing of Steps and Reasons for Delays in Obtaining Abortions in the United States, 74 Contraception 334, 341-343 (2006). See also Drey et al., Risk Factors Associated with Presenting for Abortion in the Second Trimester, 107 Obstetrics & Gynecology 128,133 (Jan. 2006) (concluding that women who have second-trimester abortions typically discover relatively late that they are pregnant). Severe fetal anomalies and health problems confronting the pregnant woman are also causes of second-trimester abortions; many such conditions cannot be diagnosed or do not develop until the second trimester. See, e. g., Finer, supra, at 344; F. Cunningham et al., Williams Obstetrics 242,290,328-329 (22d ed. 2005); cf. Sehechtman, Gray, Baty, & Rothman, Decision-Making for Termination of Pregnancies with Fetal Anomalies: Analysis of 53,000 Pregnancies, 99 Obstetrics & Gynecology 216,220-221 (Feb. 2002) (nearly all women carrying fetuses with the most serious central nervous system anomalies chose to abort their pregnancies).

 The Act’s sponsors left no doubt that their intention was to nullify our ruling in Stenberg, 530 U. S. 914. See, e. g., 149 Cong. Rec. 5731 (2003) (statement of Sen. Santorum) (“Why are we here? We are here because *175 the Supreme Court defended the indefensible.... We have responded to the Supreme Court.”). See also 148 Cong. Rec. 14273 (2002) (statement of Rep. Linder) (rejecting proposition that Congress has “no right to legislate a ban on this horrible practice because the Supreme Court says [it] cannot”).

 Even the District Court for the Southern District of New York, which was more skeptical of the health benefits of intact D&E, see ante, at 162, recognized: “[T]he Government’s own experts disagreed with almost all of Congress’s factual findings”; a “significant body of medical opinion” holds that intact D&E has safety advantages over nonintact D&E; “[p]rofessional medical associations have also expressed their view that [intact D&E] may be the safest procedure for some women”; and “[t]he evidence indicates that the same disagreement among experts found by the Supreme Court in Stenberg existed throughout the time that Congress was considering the legislation, despite Congress’s findings to the contrary.” National Abortion Federation, 330 F. Supp. 2d, at 480-482.

 The majority contends that “[i]f the intact D&E procedure is truly necessary in some circumstances, it appears likely an injection that kills the fetus is an alternative under the Act that allows the doctor to perform the procedure.” Ante, at 164. But a “significant body of medical opinion believes that inducing fetal death by injection is almost always inappropriate to the preservation of the health of women undergoing abortion because it poses tangible risk and provides no benefit to the woman.” Carhart v. Ashcroft, 331 F. Supp. 2d 805, 1028 (Neb. 2004) (internal quotation marks omitted), aff'd, 413 F. 3d 791 (CA8 2005). In some circumstances, injections are “absolutely [medically] contraindicated.” 331 F. Supp. 2d, at 1027. See also id., at 907-912; National Abortion Federation, 330 F. Supp. 2d, at 474-475; Planned Parenthood, 320 F. Supp. 2d, *181 at 995-997. The Court also identifies medical induction of labor as an alternative. See ante, at 140. That procedure, however, requires a hospital stay, ibid., rendering it inaccessible to patients who lack financial resources, and it too is considered less safe for many women, and impermissible for others. See Carhart, 331 F. Supp. 2d, at 940-949, 1017; National Abortion Federation, 330 F. Supp. 2d, at 468-470; Planned Parenthood, 320 F. Supp. 2d, at 961, n. 5, 992-994, 1000-1002.

 The Court is surely correct that, for most women, abortion is a painfully difficult decision. See ante, at 159. But “neither the weight of the scientific evidence to date nor the observable reality of 33 years of legal abortion in the United States comports with the idea that having an abortion is any more dangerous to a woman’s long-term mental health than delivering and parenting a child that she did not intend to have . . . .” Cohen, Abortion and Mental Health: Myths and Realities, 9 Guttmaeher Policy Rev. 8 (2006); see generally Bazelon, Is There a Post-Abortion Syndrome? N. Y. Times Magazine, Jan. 21, 2007, p. 40. See also, e. g., American Psychological Association, APA Briefing Paper on the Impact of Abortion (2005) (rejecting theory of a postabortion syndrome and stating that “[a]ccess to legal abortion to terminate an unwanted pregnancy is vital to safeguard both the physical and mental health of women”); Schmiege & Russo, Depression and Unwanted First Pregnancy: Longitudinal Cohort Study, 331 British Medical J. 1303 (2005) (finding no credible evidence that choosing to terminate an unwanted first pregnancy contributes to risk of subsequent depression); Gilchrist, Hannaford, Frank, & Kay, Termination of Pregnancy and Psychiatric Morbidity, 167 British J. of Psychiatry 243, 247-248 (1995) (finding, in a cohort of more than 13,000 women, that the rate of psychiatric disorder was no higher among women who terminated pregnancy than among those who carried pregnancy to term); Stotland, The Myth of the Abortion Trauma Syndrome, 268 JAMA 2078,2079 (1992) (“Scientific studies indicate that legal abortion results in fewer deleterious sequelae for women compared with other possible outcomes of unwanted pregnancy. There is no evidence of an abortion trauma syndrome.”); American Psychological Association, Council Policy Manual: (N)(I)(3), Public Interest (1989) (declaring assertions about widespread severe negative psychological effects of abortion to be “without fact”). But see Cougle, Reardon, & Coleman, Generalized Anxiety Following Unintended Pregnancies Resolved Through Childbirth and Abortion: A Cohort Study of the 1995 National Survey of Family Growth, 19 J. Anxiety Disorders *184 137,142 (2005) (advancing theory of a postabortion syndrome but acknowledging that “no causal relationship between pregnancy outcome and anxiety could be determined” from study); Reardon et al., Psychiatric Admissions of Low-Income Women Following Abortion and Childbirth, 168 Canadian Medical Assn. J. 1253,1255-1256 (May 13,2003) (concluding that psychiatric admission rates were higher for women who had an abortion compared with women who delivered); cf. Major, Psychological Implications of Abortion — Highly Charged and Rife with Misleading Research, 168 Canadian Medical Assn. J. 1257,1258 (May 13, 2003) (critiquing Rear-don study for failing to control for a host of differences between women in the delivery and abortion samples).

 Notwithstanding the “bond of love” women often have with their children, see ante, at 159, not all pregnancies, this Court has recognized, are wanted, or even the product of consensual activity. See Casey, 505 U. S., at 891 (“[0]n an average day in the United States, nearly 11,000 women are severely assaulted by their male partners. Many of these incidents involve sexual assault.”). See also Glander, Moore, Michielutte, & Parsons, The Prevalence of Domestic Violence Among Women Seeking Abortion, 91 Obstetrics & Gynecology 1002 (1998); Holmes, Resnick, Kilpatrick, & Best, Rape-Related Pregnancy: Estimates and Descriptive Characteristics from a National Sample of Women, 175 Am. J. Obstetrics & Gynecology 320 (Aug. 1996).

 Eliminating or reducing women’s reproductive choices is manifestly not a means of protecting them. When safe abortion procedures cease to be an option, many women seek other means to end unwanted or coerced pregnancies. See, e.g., World Health Organization, Unsafe Abortion: Global and Regional Estimates of the Incidence of Unsafe Abortion and Associated Mortality in 2000, pp. 3,16 (4th ed. 2004) (“Restrictive legislation is associated with a high incidence of unsafe abortion” worldwide; *185 unsafe abortion represents 13 percent of all “maternal” deaths); Henshaw, Unintended Pregnancy and Abortion: A Public Health Perspective, in A Clinician’s Guide to Medical and Surgical Abortion 11, 19 (M. Paul, E. Lichtenberg, L. Borgatta, D. Grimes, & P. Stubblefield eds. 1999) (“Before legalization, large numbers of women in the United States died from unsafe abortions.”); H. Boonstra, R. Gold, C. Richards, & L. Finer, Abortion in Women’s Lives 13, and fig. 2.2 (2006) (“as late as 1965, illegal abortion still accounted for an estimated . . . 17% of all officially reported pregnancy-related deaths”; “[djeaths from abortion declined dramatically after legalization”).

 There is, in short, no fraction because the numerator and denominator are the same: The health exception reaches only those cases where a woman’s health is at risk. Perhaps for this reason, in mandating safeguards for women’s health, we have never before invoked the “large fraction” test.